ROBERT BARRY, Appellee, v. MRS. F. A. REEVES, Appellant.

**PARENT AND CHILD: Custody of Child—Loss of Right.** The mother of an illegitimate child, who has for a long series of years evinced but a very casual interest in the child, may not successfully urge her right to the custody of the child against fit and proper parties who have nurtured, cared for, and educated the child from birth, even though they have been paid compensation by parties other than the mother, it appearing that it would not be to the best interest of the child to decree custody to the mother.

Headnote 1: 29 Cyc. pp. 1588, 1591, 1595, 1597.

Headnote 1: 41 L. R. A. (N. .S.) 564; 45 L. R. A. (N. S.) 91; 47 L. R. A. (N. S.) 1133; 14 R. C. L. 272, 273.

*Appeal from Woodbury District Court.*—ROBERT H. MUNGER, Judge.

JULY 1, 1927.

Action in habeas corpus for the custody of a minor child. The court granted the relief prayed, and awarded the custody of the child to his mother. A foster mother, who had the custody of the child at the time, appeals.—*Reversed.*

*Kindig, Stewart & Hatfield,* for appellant.

*A. C. Hatt* and *Jepson, Struble, Anderson & Sifford,* for appellee.

FAVILLE, J.—This action is brought in habeas corpus, to determine the question of the custody of a minor child. For convenience, we refer to the mother of the child as the appellee. The boy, Robert, whose custody is involved in this action, was born on the 8th day of January, 1914. At that time, the appellee was about sixteen years of age. The child was illegiti-

mate, and the record fails to disclose who his father was. The child was born at the home of the appellee's parents. It appears that, about four or five o'clock in the afternoon of the day the child was born, a nurse called upon the appellant, and inquired of the latter if she could take care of a baby. The nurse received an affirmative reply, and early that evening, she appeared at the home of the appellant, with a newly born babe, wrapped in a bath towel and carried in a closed traveling bag. The child had not been washed, and was unconscious. The skin was torn from his ears, and he had a cut on his forehead and one at the base of the skull. The nurse refused to disclose the name of the mother of the child, but gave to appellant the street address from which the child had been brought. The appellant ministered to the urgent necessities of the child at that time, and revived the flickering spark of life. The boy was delicate for the first year of his life. It was about a year and a half before the appellant discovered to whom the child belonged. From the day of his birth until about the time this action was begun, Robert remained in the home of the appellant. He has been reared as a member of that family, and until shortly before this action was commenced, believed that the appellant was his mother. He calls her "mother," and the appellant's husband "father." He bears their name, and is known by that name in the school, the church, and the community. He has been educated in the public schools, and in the Sunday school, and is a member of the Presbyterian church. He is a well behaved, well trained boy. There is no voice of condemnation, or even of criticism, raised in regard to his training and care. The appellant is proven to be a woman of good character and reputation. She is about sixty years of age, and her husband about seventy. They have been the parents of three children, two of whom are deceased, and one, a daughter, is married, and lives in Omaha. They also have an adopted boy, by the name of Richard, who is about 13 years of age.

The appellee was married on December 15, 1914, to one Davey. She gave birth to another son on June 12, 1915. The appellee has two other children, one of whom is 8, and the other 10 years of age. The children are all children of Davey. Appellee and Davey were divorced. All three of these children

reside with the appellee and her present husband, to whom she was married in September, 1923.

The appellee has resided in Sioux City ever since before Robert was born. There is some conflict in the evidence as to when the appellee first saw Robert after his birth. According to her testimony, it was possibly a year, or a year and a half; according to other testimony, it was three years. It appears without conflict, however, that the appellee made no attempt to see Robert or to inquire in regard to him until shortly before this action was brought. Although residing in the same city, the appellee made little, if any, effort during these years to keep track of Robert or to come in personal contact with him. She says, "I never went up to see Robert at his home." It appears that, shortly before this action was instituted, a picture of Robert appeared in the Sioux City Journal, in connection with a school entertainment. The appellee says that about that time she "just decided to take him and raise him and keep him." The husband of the appellee is engaged in the coal business, and he and his wife own property which is estimated as being worth about $25,000, practically all of which was inherited by the wife from her father. It also appears that the appellant and her husband own a home in a good neighborhood, and are financially able to care for, maintain, and educate Robert.

The undisputed evidence shows that the mother of the appellee has contributed to the support of the minor by frequent cash remittances to the appellant. There does not appear to have been any contract or agreement in regard to said matter, but the contributions have been substantial, and have been voluntarily made on the part of the grandmother. That they have been inadequate to fully compensate for the expense, care, and maintenance of the minor is evident.

The evidence in the case is quite voluminous. We have attempted to set out only a very brief outline of the salient facts. At the best, an action of this character must be distressing to all parties concerned, and the task imposed upon the court is one that necessarily invites profound solicitude.

The rules of law governing habeas corpus actions that involve the custody of minor children have materially changed within the last few years. This has been true of the decisions

of this court, as well as the trend of the authorities generally. In *Risting v. Sparboe,* 179 Iowa 1133, we said:

"Some of the earlier decisions seem to have treated the right of the father to the custody of the child as paramount, even absolute, except in cases of gross abuse of parental authority, and expressions seemingly in approval of such doctrine may be found in opinions of this court. See *Van Auken v. Wieman,* 128 Iowa 476; *Brem v. Swander,* 153 Iowa 669. The more recent opinions, however, quite generally regard the welfare of the child as paramount, in cases of this character. This is on the theory that every child is born a citizen, and is vested with the rights and privileges of citizenship entitling it to governmental protection; and the government can meet its obligation to protect only by consulting the welfare of the child in regulating its custody during the period of its minority."

After a review of the authorities, we also said:

"Enough has been said to indicate our disapproval of appellant's contention that the surviving parent has the absolute right to the custody of his minor child, and to express our approval of the more wholesome doctrine that, in a habeas corpus proceeding to determine the right to such custody, the primary consideration for the guidance of the court is the welfare of the child [citing cases]."

In *Barnett v. Blakeley,* 202 Iowa 1, 5, we said:

"In actions of this character, the function of the writ of habeas corpus has been modified and enlarged from its original scope as a prerogative writ. The courts generally have departed from the original purpose of the writ, which was to determine whether or not the petitioner was being illegally imprisoned. As now used and recognized, in cases involving the custody of children, the writ of habeas corpus operates to invoke the broad powers of the court of an equitable nature, to determine the question of custody of a minor child according as the welfare and best interests of the child may require, having due regard to the legal rights of parents or others. [Citing cases.]"

The appellee, as mother of the child, does not, by virtue of such relationship, have an absolute legal right to the custody of the child, as against the rights of one who may even be a stranger by blood to the minor, and against the best interests of the child. The rule, of course, does not mean that one who is in

a position, financially or socially, to do more for a child than its natural parents may do, is, because of such fact alone, entitled to the custody of a child whom he may desire to have; but, where a relationship has been knowingly established through a long term of years, and the interests and welfare of the child will be best promoted by the continuance of such relationship, situations may, and frequently do, arise where the legal rights naturally inherent in parenthood must be subordinated to the paramount interests of the child.

In *Knochemus v. King*, 193 Iowa 1282, we said:

"If the person in care of the child at the time its custody is sought to be changed has looked after its social, moral, and educational interests for many years, and the child itself has become attached to the environment and the people who have made possible the happiness of its early years, a court is not justified for slight reasons to change that environment and transfer the custody to another. There is under such circumstances a fixed relationship, and the affections of both child and the adopting parent should not be disturbed, and ordinarily cannot be changed without risking the future happiness of the child. Parental rights must sometimes yield to the feelings, interests, and rights of other parties, when acquired with the parent's consent. It would be fundamentally wrong, both in law and in morals, to sever the relations of a child from those who have nursed, loved, and cherished it for a long period of years, and such an arrangement under an agreement, express or implied, should not be revocable at the pleasure of parent."

The testimony very satisfactorily establishes that the home of the appellant, the character of herself and her husband, and the surroundings, are in every way proper for the training of Robert to good citizenship and Christian character. There is some suggestion in the evidence to the effect that the appellant has furnished a home for many unfortunate children. This was in years long gone by, and there is no evidence of any improper or illegal conduct on her part in connection with said matter. The evidence is abundant that the appellant and her husband have a deep affection for the boy, and that this is reciprocated, and that he regards them as his parents, and has an affection for them. In all respects, the relation between the appellant and her husband and Robert is such as should exist between natural par-

ents and a child. Great weight should be given to the fact that
the boy has reached such an age of discretion that he is capable
of expressing a preference in this matter, which is entitled to
proper consideration. He unhesitatingly expresses a desire to
remain in the home of the appellant.

It is true that the appellee is the natural mother of this
child. It is also true that she doubtless relied upon Robert's
grandmother to make some compensation for his care; but the
instincts of motherhood did not prompt her to make frequent
inquiry in regard to his welfare, nor cause her to endeavor to
see him or to share in any degree his companionship. In the
meantime, her life has necessarily been largely filled with other
cares and duties. A marriage which proved unfortunate, and re-
sulted in a divorce, and the birth of three other children, and a
remarriage and the establishment of a new home, have undoubt-
edly filled her life with other cares. She is now married to
another man, who already has the burden of assuming a father's
relation to three minor children of the appellee's. To take Rob-
ert from the congenial home in which he has been reared all of
these years, and to place him in these new surroundings, with
three other children, with a mother who, to say the least, has not
been solicitous for his welfare until recently, and under the con-
trol of a stepfather who already has three stepchildren in his
household, coupled with all the other facts and circumstances
surrounding the respective homes and the conditions of the
parties as disclosed by this record, would not, we believe, be for
the best interests of this child. This mother, without there being
any reasonable excuse therefor, has lived in the same city with
her son for these years without evincing more than what might
be termed a casual interest in him, and without any effort to
share his companionship or give to him any of her individual
care or affection; while, in the meantime, to her knowledge, the
appellant and her husband were rearing this child as their own,
giving him care and affection, training and education; and nec-
essarily, day by day the bonds of filial affection between him and
the appellant and her husband were being strengthened. We
are thoroughly persuaded that the best interests of the child will
be promoted by his retention in the home where he has been
reared from the day of his birth, and that the claims of the
appellee to the custody of the child, under all of the facts and

circumstances as shown by the record, in view of the promotion of the best interests of the child, must be deemed to be inferior to those of the appellant. We reach the conclusion that the trial court erred, upon this record, under the law applicable to the case; in awarding the custody of said child to the appellee, and the judgment appealed from must be, and it is,—*Reversed.*

EVANS, C. J., and STEVENS, DE GRAFF, VERMILION, ALBERT, and MORLING, JJ., concur,

KINDIG, J., having been of counsel, takes no part.