JAMES RICHARD WOOLEY, Appellant, v. HOMER SCHOOP, Appellee.

No. 46337.

JANUARY 11, 1944.

REHEARING DENIED MARCH 10, 1944.

Jones & Cambridge, of Atlantic, for appellant.

Genung & Genung, of Glenwood, and J. J. Hess, of Council Bluffs, for appellee.

MULRONEY, J.—This case requires us to determine de novo the correctness of the ruling of the trial court denying a father custody of his eleven-year-old son in habeas corpus proceedings brought by the father. The father, Harry Wooley, hereinafter called the plaintiff, filed the petition for the writ in behalf of his son alleging that, as father, he was entitled to the custody of his child and that "the defendant refuses to deliver said child" to him. The petition set forth that the defendant made some pretension of the right of custody over the boy by reason of the fact that defendant had married the boy's mother; that the boy's mother had died; and actual custody of the boy had been with defendant since the mother's death.

The writ duly issued and after trial the court dismissed plaintiff's petition holding "that the best interests of the minor child will be served by allowing custody to remain in this defendant."

James Richard Wooley was eleven years old at the time of the trial in the district court in November of 1942. He had lived with his parents until he was about eight years old, at which time the family lived in Griswold, Iowa. His father, the plaintiff in this action, was a trucker and he did some carpenter work. His mother worked part of the time. In 1939 his parents separated and the boy and his mother went to live with her parents on a farm at Oakland, Iowa, and the father went to Colorado. In April of 1940 the boy's mother filed suit for divorce against the plaintiff at Avoca, Iowa, alleging cruel and inhuman treatment. Although it appears plaintiff had notice of this action he did not contest it and the boy's mother obtained her divorce decree April 16, 1940. The decree granted custody of the boy to the mother. In June of 1940 the boy's mother married the defendant, Homer Schoop. The defendant ran a small restaurant in Emerson, and the mother and son went to Emerson, where they lived with the defendant until she was killed in an automobile accident on April 5, 1942. The defendant and the boy were injured in this same accident. The boy was in the hospital for three months after the accident and during this time the father came back from Colorado to visit him. While in Iowa the father retained the services of an attorney at Carson, Iowa, to secure the custody of his son for him and he then returned to Colorado. The father had remarried in November of 1940 and he had another son who was then about a year old.

Shortly after the accident the defendant was appointed guardian of the property of the boy and a suit was commenced by him as guardian to recover damages for the boy's injuries. In July of 1942 the father received a letter from his Iowa attorney advising him that he had talked with Mr. Hess, the defendant's attorney, and he had requested him to do nothing about the custody matter until the damage suit was settled. The damage suit was later settled for $1,500 and the father then brought these proceedings for the custody of his son in November of 1942.

■ We will discuss the evidence in more detail but this summarized statement of the undisputed facts will suffice while we state the law that governs these proceedings. Section 12573, Code of 1939, provides that: "Parents are the natural guardians of the persons of their minor children, and equally entitled to their care and custody." And section 12574 provides: "The surviving parent becomes such guardian * * *." In Allender v. Selders, 227 Iowa 1324, 1331, 291 N. W. 176, 180, Justice Bliss, speaking for the court, with regard to this statutory right of custody, stated:

"While the mother of the plaintiff lived she had as much right, legally, to his custody as the father, but upon her death, that legal custodial right devolved upon the father. This right of a surviving parent is an absolute one, unless it has been relinquished by abandonment, contract, or otherwise, or unless the best interest and welfare of the child call for other care and custody."

And in In re Guardianship of McFarland, 214 Iowa 417, 425, 239 N. W. 702, 706, we said:

"* * * upon her [the mother's] death, according to the statutory law, in the light of our previous pronouncements, the husband became entitled to his [the son's] custody, unless it be that he had abandoned the child, or forfeited or waived his rights to his custody, or unless it be that he is not a fit and suitable person to have his custody and the best interests of the child require that his custody be entrusted to others. See Miller v. Miller, 123 Iowa 165; Brem v. Swander, 153 Iowa 669; Jensen v. Sorenson, 211 Iowa 354."

In Van Auken v. Wieman, 128 Iowa 476, 478, 104 N. W. 464, we stated:

"By the statute, parents are declared to be the natural guardians of the persons of their minor children, and entitled to their care and custody. * * * There is no ground upon which the courts can interfere with the right thus recognized, except that of imperative necessity; that is to say, there can be no interference with the natural right of a parent except upon showing

of gross misconduct, either wilful or enforced, and in character such as to threaten serious and permanent detriment to the rights and interests of the child. No consideration such as the advantage of wealth, or social status, or even of personal affection, can of itself be sufficient. If the parent is a proper and competent person, and has not waived or forfeited his right, custody must be awarded to him."

This language in the Van Auken case was quoted in Adair v. Clure, 218 Iowa 482, 487, 255 N. W. 658.

▮ I. Does the record show that the father abandoned his child or forfeited or waived his right to custody? There is not any testimony that would sustain such a conclusion. True, in the divorce proceedings the custody was taken away from him and placed in his wife. But this is not such an abandonment or waiver of his right to custody that would forever preclude his assertion of his statutory custodial rights when the wife and mother died. The father testified:

"I have desired the custody of this boy ever since the death of his mother."

He came back from Colorado to visit his son when he was in the hospital right after the mother was killed, and he further testified:

"At the time I visited the boy when he was in the hospital I retained the services of an attorney to secure that custody, there was never anything done and I received a letter from this attorney saying that he had talked with Mr. Hess requesting that I leave everything go until the suit on the auto accident was settled. I have always insisted that I wanted the custody of the boy. This matter has never been delayed at my request. I received this letter from my attorney in July and I immediately answered it telling him to do what was best and that I was thinking of the welfare of the boy, but that I wanted the boy as soon as I could have him."

The record shows that on April 21, 1942, sixteen days after the boy was injured in the tragic accident that cost his mother her life, the defendant was appointed guardian of the property

of the boy. Sometime thereafter the guardian settled the claim of his ward against those responsible for his injury for $1,500. The record does not show when this settlement was made, but it was made sometime before November 28, 1942, the date of the trial, and the defendant admitted plaintiff's attorney came to him before the writ was issued and asked that he deliver over possession of the boy to plaintiff, and the defendant testified: "I refused to deliver the boy over."

Under such a record, can it be said the father had abandoned his child? Of course not. A father does not abandon his statutory right of custody when he leaves the child with its mother. Much is said in argument of his failure to send money to support the child. This was a matter between the father and the mother when the latter was living. It was somewhat significant that the divorce court did not award support money for the child or alimony to the wife. The father testified that he sent the boy clothes "every birthday and every Christmas," and he further testified:

"I wrote her [the mother] several times asking her what the boy needed and she never answered my letters."

The fact that in the divorce action the custody is awarded to one parent does not mean that the other has waived forever the statutory right of custody of his or her child. A husband who no longer bears love and affection for his wife might well reason that his children would be better off with their mother than with him. As against his wife he possesses no prior statutory right of custody that he could waive. In fact, statutory rights of custody are not involved in divorce actions. The court only decides the legal right of custody between the two persons who possess the statutory right of custody. Waiver is the voluntary relinquishment of a known right. There is nothing voluntary about a court decree against a defaulting defendant, but even if the surrender of custody by the father to the mother were voluntary, a stranger could not take the child after the mother's death and argue that because of the voluntary surrender of custody to the mother the father has lost his statutory right of custody. By such a voluntary surrender of custody the father would not be reduced to the status of a stranger to the child,

whose only right against another stranger is to petition the court for the custody of his son, without the aid of any statutory right or presumption. It is clear under this record that the plaintiff's statutory right of custody has not been waived or abandoned.

II. Our next inquiry should be, Is the father a fit and suitable person to be entrusted with the custody of his own son? We have only the record before us to judge, and the evidence answers this interrogatory in the affirmative. Not one single witness testified against this father. The defendant, who disputes a father's claim to his own son, neither testified that the father was an unfit person nor did he produce a single witness who would testify that the father was not a suitable person to be entrusted with the custody of his son.

The father testified that he remarried in November of 1940 and he now has a home that he is paying for on contract. When he first went to Colorado he was on the road working for an oil company for a little over three years, and at the time of trial he worked for the Rocky Mountain Arsenal, near Denver, earning $40 to $50 a week. He now has another son fourteen or fifteen months old, and he testified his present wife is "agreeable and willing to have him [James Richard Wooley] in that home and wishes to assist me in making a home for him." The mother of the dead wife, the child's maternal grandmother, when asked if she thought the plaintiff was a fit person to have custody of his son, stated:

"I would rather that you folks decide that yourselves between the two boys because they are both good boys. I do not know of any reason why he wouldn't be a fit person, they have been awful good to the boy."

The plaintiff's brother and sister-in-law, and one other witness, who knew him since infancy, testified that plaintiff was honest, hard-working, and a man who had never been in any trouble of any kind and that he would be a fit person to have custody of his son. Upon this issue the burden is surely upon the defendant who disputes a father's claim of custody. See In re Guardianship of McFarland, supra, where the court stated, at page 429 of 214 Iowa, page 708 of 239 N. W.:

"The presumption existing in favor of the father has not been overcome in the instant case. * * * No witness has declared that the father is not a fit and suitable person to have the custody of his boy. Without any hesitancy, the witnesses testified in favor of the plaintiff-father in this respect."

When he who comes between a father and his son does not even show any evidence of the father's unfitness for custody, the decision on this issue should favor the father.

The only argument by defendant is that the father is not a fit person because of his conduct that led to the divorce proceedings. A default divorce decree on the ground of the husband's cruelty does not always portray the entire picture of the marital rift. Quite often the divorce is the result of mutual fault where both parties desire to end the marriage contract and they agree that one party will be allowed to "prove up." The cold record of a decree obtained in such a default proceeding does not forever brand the defaulting defendant as a person "unfit" for the custody of his or her child. This same argument was advanced in Brem v. Swander, 153 Iowa 669, 672, 132 N. W. 829, 831, where we stated:

"The question to be decided, therefore, is simply this, whether plaintiff is so far an unsuitable person for the custody of these children that the court will set aside his natural and statutory right, and, for the best interest of the children, award their custody to the defendant. * * * Much is said in argument for appellant in regard to the circumstances attending the procurement by plaintiff of a divorce, and it is contended that plaintiff had, prior to the departure of his wife and these two children, entered into illicit relations with the woman who has become his present wife, that it was for this reason that his wife desired to return to Iowa, and that the installation of this woman as housekeeper after his wife's departure, and his marriage to her as soon as the law would permit after the procurement of the divorce, characterize the plaintiff as an immoral person, unsuitable for the custody of these children. * * * The real question is as to the present ability and fitness of the plaintiff to care for these children as father, and we would hardly be justified in overhauling his entire previous life for the purpose of seeing

whether there was something discoverable which might give rise to a suspicion or even a belief that his conduct has not always been beyond proper censure. This is said particularly with reference to his conduct towards the mother of these children, which, as it seems to us, was censurable at least in lack of consideration and affection.''

■ III. Does the evidence show that it would be for the best interest of the boy to leave him with the defendant? Ordinarily the best interest of a child is served by placing the child in the custody of a fit and proper parent. The defendant is no ''kith or kin'' of James Richard Wooley. He was married to the boy's mother for about two years before she was killed. He was twenty-seven years old at the time of trial, with something less than an eighth-grade education. He runs a little restaurant in Emerson, Iowa, a town of about 550 inhabitants. He testified:

''I have run this restaurant going on five years. It is just an eating joint or place. Sandwiches especially. I don't have tables, just have a counter and serve drinks. I don't serve beer. The place seats eleven and the only people who work in there is my mother and myself. I open between six and six-thirty in the morning and close between twelve and one at night. * * * Q. As a matter of fact you don't have much time for this boy? A. He comes down there when he is out of school, and eats his meals there, and plays with the boys around there. He spends his time around the restaurant and plays at home too, at both places.''

The defendant's mother works in the restaurant with him and they live in a home about a block and a half from the restaurant, where James Richard Wooley sleeps with the defendant. Defendant's only other witness, who described himself as a ''farmer and retired doctor,'' testified as to defendant's good reputation and described the restaurant as a ''reputable place.'' This witness further testified:

''Q. Would you say Mrs. Schoop's home was a proper place to raise a boy of this boy's age? A. I would qualify it. If she does as well for him as she did for Homer, it would be proper. I know nothing absolutely against him.''

This is absolutely all of defendant's testimony.

As to the father's side of the case we find that the record is without dispute that there is a home for this child with his father and half brother and his father's second wife. This home is near Denver, within half a mile of a country school.

Defendant argues that we know but little about the Colorado home to which this boy will be taken if custody were awarded to the father. We know it is a home that the father is buying in a suburban area, where this boy's baby half brother is living with James' stepmother—a stepmother who, the record shows, wants to help her husband make a home for the boy. But counsel point out that this stepmother did not attend the trial and the district court was not given an opportunity to see and estimate the stepmother who would have partial care of the child. Surely that is understandable; a stepmother with a fifteen-month-old baby might find it rather difficult to travel from Colorado to Iowa. Mrs. Schoop did not testify, although she lived in the same county.

Perhaps when the court concluded that the best interest of the child would be served by leaving him in defendant's custody it had in mind the boy's testimony. The boy was not sworn as a witness, but he was asked questions by the attorneys and the court. He stated that he lived with "Grandma Schoop"; that Homer Schoop and his mother treated him well; and he wanted to live with Homer Schoop. He told of the family trouble before the divorce, when his father struck his mother, and he said:

"She was out with another man."

He further stated:

"Q. Well, suppose the Court made an order that you could go and live with your father, what would you think about that? A. I don't know. Q. You say you wouldn't care to go out there? A. No, sir. Q. You want to stay here in Emerson? A. Yes, sir. * * * Q. You don't care anything about going to Denver? A. No, sir. Q. And go and live with your father? A. No, sir. Q. Have you ever seen his present wife? A. Yes, sir, once. Q. That was when? A. Christmas. Q. Christmas a year ago? A. Yes, sir. Q. Do you think you would care anything about living with her? A. I don't know, I wasn't around her. Q. You

haven't any idea about that? A. No, sir. * * * Q. When your father came to see you in the hospital did he say anything about your going to live with him? A. Yes, he asked me how I would like to stay with him. Q. You told him, did you? A. I didn't know. Q. He asked you and you told him you didn't know? A. Yes.''

But, we must remember, this boy came to the courtroom from the Schoop home. He sat there facing Schoop and his father. We have no doubt that Schoop and his mother were kind to him. He had not seen much of his father since he was seven or eight years old. He stated that his father never struck him. The child's preference is important when the contest for his custody is between parents. It might be of some value when the contest is between a parent and other relatives, such as grandparents. But it is not very persuasive when the contest is between a parent and one who stands in no blood relationship to the child.

The defendant testified that he knew of no reason why he could not take care of the boy until he became a man able to take care of himself. He further testified that he intended to make the boy "beneficiary" of whatever property he has. With normal expectancy, the boy will be far past his majority before he succeeds to defendant's property, if by "beneficiary" the defendant meant heir or legatee. The defendant is a young man who is likely to marry again. His interest in the boy might conceivably wane in the years to come because of children of his own. In In re Guardianship of McFarland, supra, we said, at page 430 of 214 Iowa, page 708 of 239 N. W.:

''But the appellant contends that the father should not have the custody of the child because this seven-year-old boy, upon the witness stand, expressed his desire to remain in the home of his grandfather. It must be apparent that he has not yet reached the age of judgment and discretion. * * * In this case, there has been no abandonment by the father, and the boy has not reached the age where his wishes at this time can be given much, if any, consideration.''

In the case of Brem v. Swander, supra, 153 Iowa 669, 675, 132 N. W. 829, 832, the twelve-year-old daughter had much the same feeling toward her father, and there we stated:

"But we find nothing to indicate that, if these two children are restored to their father, they will not, within a reasonable time, be satisfied with their relations to him and his present wife. They have been separated from him for several years, and the separation had been under circumstances somewhat calculated to prejudice them against him. The youngest is now only six years of age, and therefore not old enough to have any deep-seated preferences. The girl, Esther, appears to entertain a prejudice against her father founded upon his treatment of her mother, which she may well abandon when she is established in his home. Under any circumstances, the affections of children for others than their parents are not sufficient in themselves to warrant the repudiation of the natural relationship of parent and child."

When we speak of what is best for the child we do not mean that which the child wants. The best thing for any child is to be with good parents, whether they be rich or poor or whether their home be a shanty or a mansion. If one parent be dead, the best thing for any child is to be with the surviving parent, provided · that parent is a fit person for his custody. Upon this record, where no one even challenges the father's fitness, and the only testimony is that he is a fit person for his child's custody, the answer to the question is clear. The best interest of the boy will be served by turning him over to his father's custody.

For the reasons stated, the judgment of the trial court is reversed and the case is remanded for judgment in harmony herewith.—Reversed.

SMITH, C. J., and BLISS, WENNERSTRUM, and MILLER, JJ., concur.

HALE, GARFIELD, OLIVER, and MANTZ, JJ., dissent.

HALE, J. (dissenting)—I am unable to agree with the conclusion reached by the majority in this case. I am satisfied that our failure to arrive at the same result arises largely from the different weight we place on the child's welfare and the parent's presumptive right. Aside from the statutory provision, it is unquestioned that there is a presumption that the parent ordinarily has not only the natural but the legal right to custody of the

child; that natural parental affection will guarantee the child's future welfare. But this is not true or controlling in all cases. The paramount consideration which has run through all of our cases is the best interest of the child.

The majority opinion devotes some space to the question of whether or not the child was abandoned by the father. In the sense that the boy was completely cut off and forgotten by his father, the evidence does not so indicate, but, as I read the record, I do not find that the father has shown the deep interest which we usually expect and generally find in parents who have their children's best interests at heart. Nor am I much concerned with the effect of the divorce decree, although I cannot agree with the statement that statutory rights of custody are not involved in divorce actions and that the court only decides the legal right of custody between the two persons who possess the statutory right of custody. As a matter of fact, in divorce proceedings, as in habeas corpus and juvenile actions, the interest of the child should be, and is, guarded, and there are cases where the district court fails to award the custody to either parent, having in mind the future interest and moral welfare of the child. It would be an unsupported conclusion for us to assume that in the divorce proceedings between the parents in this case there was no consideration given to the welfare of the child.

As to whether the father is a fit and suitable person to be custodian of the child the evidence is not very convincing. As to his present condition we have only the testimony of the father himself. Dating back to the time when plaintiff was a resident of Iowa, the evidence as to his character comes from his brother and sister-in-law, witnesses closely related. The child's maternal grandmother evidently desired to avoid any responsibility as a witness and to take no part in the controversy. So far as the future of the child is concerned, we have the father's testimony that he lives outside of Denver; that he is employed in war work (which employment in all probability will be temporary); that he is paying for a house, but with no statement as to how nearly the payments are completed or whether there have been one or many payments made; and that the stepmother is willing that the boy should make his home with them. Thus the present situation and the prospect for the boy's future surroundings

finally settle down, in substance, to what the father can promise. The evidence is scant. On the other hand, there can be little dispute that the boy is now well situated; that he is doing well in school; and that he is in a home which, as shown by the results, is suitable and proper.

The majority suggest that the defendant, the present custodian, may marry again. This is, of course, speculation. But even if a new home should be created, it is no more than what has actually taken place with the father. Many things might occur which would alter the present situation, but we are concerned now more with what that situation is at present, rather than with some imaginary future condition. From what we now know, the boy's present surroundings are good and such as in all probability will conduce to his future welfare. No one can predict with certainty what the years may bring forth. The contingency suggested is not a dangerous one nor one from which we should fear much trouble. The child is, and should be, in the jurisdiction and control of the courts of this state, and if at any time any necessity arises for a transfer of custody, or if in the future it should not be to the best interests of the child for him to remain where he now is, under custody and guardianship of people whose character is shown to be excellent, the courts have the jurisdiction and power to make any such changes as may be for the best interests of the child and his well-being. The courts of Iowa have jurisdiction. They should retain it. I do not suggest that the courts of other states would be less effective if their jurisdiction is invoked. But therein lies the trouble. Here in the neighborhood where the child has grown up and is known, proper attention to his interests is more likely to be given than if we place the boy in strange surroundings, among strange people, and take him from neighbors and friends who have known him all his life.

The majority opinion states that when we speak of what is best for the child we do not mean that which the child wants. However, the child's wishes and the attachment he has formed for his present home are properly taken into consideration. They are, of course, not controlling, but are nevertheless to be considered. See Knochemus v. King, 193 Iowa 1282, 188 N. W. 957, in which case the wish of the child was the determining factor.

The boy's contentment with his present surroundings enters into what is for the best interest of the child.

The language of Justice Evans in Jensen v. Sorenson, 211 Iowa 354, 364, 233 N. W. 717, 722, is applicable in this case: ˙

"The child must be given a place to *grow*. It should not be too readily transplanted. Nor should it be tossed like a ball from base to base. For three years this child has been growing in the Sorenson family, and has found affection there. In our judgment, no adequate reason is shown in the record for a change of custody, unless it should be held that the father has a primary right to such custody. In cases where others than the parent have maintained the care and custody of a child and have become bound to it in affection, we have not infrequently held the rights of such custodian to be paramount to the rights of a parent, in a given case. Much that we have said in previous cases is quite applicable to the case at bar." Citing cases.

A child's habits and affections are fixed and deep-set. We should not without good cause change his environment or associations. When these are of satisfactory character they should not be lightly interfered with. We are asked, on a slight showing, to remove this child from proper and known surroundings to those of which we know very little, if anything. This is a step which the court should hesitate to take. At best, the granting of the parent's claim would involve a doubtful risk as to the future happiness and welfare of the child, and in such case the doubt should be resolved in favor of the child.

While this case is triable de novo, I am inclined to attach considerable importance to the finding of the district court. The trial judge had the opportunity to weigh the testimony, to see the witnesses, and to estimate the character of plaintiff and defendant. It was no doubt influenced by such estimate, and properly so. The character and suitability of each party as they appeared in the hearing were guides to the court's decision. Cases of this kind are among the most important that come before the district court and are tried with the full realization that the future of the child rests largely upon the court's action. I do not say that a decision of this nature on appeal must necessarily follow the district court, but I do urge that proper con-

sideration should be given to the court's estimate of the parties, and its impression of the child himself, derived from his interview during the trial.

We are here asked to reverse the decision of the district court, which decision, I am satisfied, was made after a careful and conscientious review of everything which entered into the case. The majority opinion is largely based upon a strict construction of the statute which gives equally to the parents the natural guardianship of the children and their care and custody. Code of 1939, section 12573. This, of course, does not mean that the right of custody is absolute in either or both parents in all cases. When the best interests of the child are considered, it has ever been our holding that such interests are paramount. Knochemus v. King, supra; Risting v. Sparboe, 179 Iowa 1133, 162 N. W. 592, L. R. A. 1917E, 318; Ellison v. Platts, 226 Iowa 1211, 286 N. W. 413, and cases cited.

I would affirm the decision of the district court.

OLIVER, GARFIELD, and MANTZ, JJ., join in this dissent.

GARFIELD, J. (dissenting)—I join in the dissent of Justice Hale but desire to point out what I believe to be the fallacy of the majority opinion.

They apparently hold that, where the mother is dead, any father who has not abandoned his child and who asks for his custody is entitled to it unless the one having custody proves that the father is unfit to have it. They say: "Upon this issue [the father's fitness] the burden is surely upon the defendant who disputes a father's claim of custody." At the outset the majority concede that the father is not entitled to custody if " 'the best interest and welfare of the child call for other care and custody.' " [Allender v. Selders, 227 Iowa 1324, 1331, 291 N. W. 176, 180.] The majority easily answer this requirement, however, by the pronouncement: "If one parent be dead, the best thing for any child is to be with the surviving parent, provided that parent is a fit person for his custody." No authority is cited for this holding, which means, when coupled with the majority's pronouncement on the burden of proof, that a father is entitled to prevail unless the custodian is able to establish the father's unfitness. No opinion of this court supports such de-

cision, which is contrary to our repeated holdings that the best interests of the child are controlling. See our latest case of this kind, Lancey v. Shelley, 232 Iowa 178, 183, 2 N. W. 2d 781, 783, citing numerous authorities, where we say, " 'the well settled rule in this state is that the paramount consideration is the best interests of the child.' "

In the latest case cited by the majority, Allender v. Selders, 227 Iowa 1324, 1330, 291 N. W. 176, 179, we say:

" 'In time, however, it [habeas corpus] was extended to controversies touching the custody of children, which were governed, not so much by considerations of strictly legal rights, as by those of expediency and equity and, above all, the interests of the child.' [People ex rel. Riesner v. New York Nursery and Child's Hospital, 230 N. Y. 119, 124, 129 N. E. 341, 343.] * * *

" 'The legal rights of a parent are very gravely considered, but are not enforced to the disadvantage of the child. Such is the universal practice.' [State ex rel. Jones v. West, 139 Tenn. 522, 527, 201 S. W. 743, 744, Ann. Cas. 1918D, 749.] * * *

"The controlling consideration should be the present and future best interests of the child, with due regard to the natural rights of the parent. * * *

"With these rules to guide us, and keeping particularly in mind that the best interests and welfare of the plaintiff [child], both present and future, are paramount to the rights of the father, and also to those of the defendants, let us consider the facts a little further."

Especially applicable here is Barry v. Reeves, 203 Iowa 1345, 1347, 1348, 214 N. W. 519, 520, where we say:

"The rules of law governing habeas corpus actions that involve the custody of minor children have materially changed within the last few years. This has been true of the decisions of this court, as well as the trend of the authorities generally. In Risting v. Sparboe, 179 Iowa 1133, we said:

" 'Some of the earlier decisions seem to have treated the right of the father to the custody of the child as paramount, even absolute, except in cases of gross abuse of parental authority, and expressions seemingly in approval of such doctrine may be

found in opinions of this court. See Van Auken v. Wieman, 128 Iowa 476; Brem v. Swander, 153 Iowa 669. The more recent opinions, however, quite generally regard the welfare of the child as paramount, in cases of this character.' "

The majority cite and quote at length from Van Auken v. Wieman and Brem v. Swander, which were repudiated in Risting v. Sparboe and Barry v. Reeves.

The majority say, without citing any authority therefor, "The child's preference * * * is not very persuasive when the contest is between a parent and one who stands in no blood relationship to the child."

In Barry v. Reeves, supra, 203 Iowa 1345, 1350, 214 N. W. 519, 521, a contest between the mother of a boy of about the same age as the Wooley boy and one who was not related to him, we say:

"Great weight should be given to the fact that the boy has reached such an age of discretion that he is capable of expressing a preference in this matter, which is entitled to proper consideration."

I think it is a grave mistake to take this boy, who was twelve years old in May 1943, from the home of his stepfather and the latter's mother in the little town of Emerson, where he is happy, contented, well off, and *wants to stay,* and force him against his will into a strange home *of which we know nothing,* in the outskirts of Denver, with his father, of whom he has seen practically nothing for about five years, and his new wife *of whom we know nothing* and who is a stranger to the boy, contrary to the judgment of an experienced trial court, who itself questioned the boy at length. It is specially detrimental to the welfare of the boy to execute the mandate of the majority during the current school year.

HALE, OLIVER, and MANTZ, JJ., join in this dissent.