STATE OF IOWA ex rel. ROBERT S. BRUNER, County Attorney, appellee, v. SHIRLEY SANDERS et al., appellants.

No. 51240.

(Reported in 129 N. W.2d 602)

July 16, 1964.

Arthur A. Neu, of Carroll, for appellants.

Evan Hultman, Attorney General, John Allen, Assistant Attorney General, Robert S. Bruner, County Attorney, and Edward S. White, both of Carroll, for appellee.

Moore, J.—About February 3, 1963, the juvenile probation officer for the Sixteenth Judicial District of Iowa, the Carroll county sheriff, a deputy, and members of the county health board visited the farm home of Mr. and Mrs. Carl Sanders.

The conditions they found are best described by this undisputed testimony of the probation officer given in juvenile court on February 16, 1963:

"I observed in the outside farmyard tall weeds growing all over and there was junk and farm machinery scattered about. The inside of the house was so cluttered with junk and filth you could hardly walk through it. From the looks of the kitchen it had not been used and you couldn't even get into it, it was piled so high with junk. We then went to what I assume was supposed to be a dining room. It has an old studio couch and it was so cluttered there was just a small path through, and I walked into a hallway that leads down to the stairway; it is very narrow path with dirty clothes and things scattered and piled up. It appeared that the cooking had been done in what was supposed to be the dining room. There is an old studio couch with old bedding on it and there is a table completely filled with bottles, glasses, dishes and things like that, all dirty. In the corner there was an electric frying pan, in which it looked like they had been doing their cooking. All the food I saw were cereals on the table and there was evidence that the children had eaten their breakfast there. I did not see a refrigerator, or a deepfreeze and the stove is not in use. We tried to get into the bedroom downstairs and couldn't get the door open enough so I could get in. It was cluttered with clothes on the floor, and was generally in the same condition as the other rooms I have described. I did not go upstairs. The downstairs rooms I saw were part of the one I couldn't get into, the hallway that leads to the stairway, the dining room, the kitchen and a small hallway beside the kitchen. They have a cream separator that has been operated fairly recently because there was milk running over the side of it and down on the floor. Over the years this milk has been running on the floor and has never been cleaned up. The house wasn't heated too well when I was there and I was informed one of the radiators had broken upstairs. There is a hot water furnace which furnishes central heating. * * *

"About nine years ago when I was sheriff, I made an investigation of that home. Mrs. Geary was only eleven years old at that time. About nine years ago the Sanders had taken a trip out of the state and left two small children at home alone. I received a call and went out there. I took the deputy sheriff

and a highway patrolman along and we viewed the house at the time and shot pictures. Plaintiff's Exhibit A through G are the pictures I took of the inside and outside of the Carl Sanders' home nine years ago. The place is in worse condition now than it was when the pictures were taken. More junk and filth had been added over the years. At that time, I could get back far enough to shoot pictures. At this time, it is so cluttered you don't have room to shoot a picture. At that time they were using the kitchen although it was filthy, but this time it's so cluttered they can't use the kitchen."

At the time of this visit the Sanders were on a trip to California. They had arranged to have their three minor children, Shirley, 14, Joni, 12, and Lynn, 5, stay at Lake View with their married daughter and her husband, Mr. and Mrs. William Geary. Mr. Geary was to get up at 5 a.m. and take the two girls to the Sanders' farm where they were to do the chores and then take the school bus to Wall Lake. After school they were to return to the farm, do the chores and then be taken back to Lake View for the night.

February 4, 1963, the Carroll county attorney filed a petition (section 232.5, Code, 1962) alleging Shirley, Joni and Lynn were dependent and neglected children. Section 232.2, Code, 1962, defines dependent or neglected child as any child who, for any reason: "3. Is without proper parental care or guardianship, * * *. 6. Is living in a home which is unfit for such child; * * *. 7. Is living under such other unfit surroundings as bring such child, in the opinion of the court, within the spirit of this chapter." Section 232.39 states "This chapter shall be liberally construed to the end that its purpose may be carried out."

The court immediately granted temporary custody of the three children to the probation officer and Mrs. Geary. See section 232.14.

At the first hearing on February 16, 1963, after taking the testimony of the probation officer, the county superintendent of schools (an ex officio member of the county board of health) and consultation with the attorneys for all parties, the court ordered temporary custody of the three minor children remain

with the probation officer and Mrs. Geary until the end of the school year and continued the hearing until that time. The parents and children were given rights of reasonable visitation. The parents were ordered to pay $100 per month as child support.

Whether the order was made pursuant to agreement of the parties does not clearly appear. Such an agreement by Mr. and Mrs. Sanders is indicated. The order provided nothing further was to be done until the court received a report on the psychiatric examination to which each parent agreed to submit.

August 9, 1963, the hearing was resumed. It is referred to in the record as the second hearing. Many witnesses, including the parents and the three children, testified. The psychiatric examination report was made a part of the record.

The trial court made findings and conclusions after the second hearing, including:

"The only concern of this Court is the spiritual, moral, mental and physical welfare of the children. These children have gained a new self-respect for themselves in their new foster home. The children have never lost their love for their parents, but they did lose respect for their parents because of the filthy and intolerable conditions of the home.

"Now, the Court has set precedents before I can ever consider letting these children go back to the home, and these parents have tried to live up to them. While I am concerned with the welfare of the children, this Court would miserably fail in its duty if it would alienate the love of the parents or children for each other. This is a very delicate case. The children have indicated they would like to remain where they are. They have new friends. They have gained their self-respect. They are clean. I don't want to foreclose the parents, and the only way I can figure for the parents to gain the respect of their children is to give them an opportunity to have them in their home. That cannot be done during the school year.

"I believe that I will leave the children in their sister's home during the school year, and I will give the parents a chance to gain the respect of these children by having them in their home for the entire summer vacation, and at the end of

that time we will have another hearing and the children will indicate to me where they want to live and go to school the following year. * * * I do have to raise the amount of the allotment for the children, including minor medical clothing and all. I believe the sum of $175 a month starting today should be the amount. I wish, if possible, for this family to be more together on Sundays and I want them to be welcome in the home. I want them to be welcome to take these children to picnics. I feel we all would fail if we in anyway break up this family at all. The parents have grown in my estimation as well as the children. They are so much cleaner looking and so much more willing and they are trying so hard. If we all work together, this will work out nicely. I will sign an order retaining the custody during the school year in Mrs. William Geary and Mr. Thorup, the probation officer, but at the end of the school year the parents will be allowed to take these three children in their home for the three summer months, and prior to the start of school we will have another hearing and the children will elect where they wish to stay."

From the order made in accordance with the court's findings and conclusions, the parents have appealed. They will be referred to as appellants or parents.

Appellants contend the court (1) erred in the method utilized in questioning the three children in closed chambers concerning their preference, and (2) abused its discretion in failing to award them custody of their three minor children.

With no apparent effort by appellants to shorten the time for filing the record and brief and arguments this case was not orally argued and submitted to us until June 10, 1964. The children were then living in the parents' home where they are to remain subject to another hearing and determination of custody late in August.

I. Appellee argues we have only moot questions which need not be decided. This contention has considerable merit. In Nitta v. Kuda, 249 Iowa 853, 857, 89 N.W.2d 149, 151, we say:

"We have often said that we will not decide moot questions. More than once this court has been faced with a situation

in which the passage of time made any remedy impossible. If we should consider this cause on its merits and disagree with the holding of the trial court, it is apparent no benefit to the plaintiff-appellant could result. * * * The record shows affirmatively that only a moot question is presented, and in such cases we decline to act."

See also Manning v. Heath, 206 Iowa 952, 221 N.W. 560; Humble v. Carter, 210 Iowa 551, 231 N.W. 341, in each of which we dismissed the appeal for the reason only moot questions were presented.

However because courts favor trials and decisions upon the merits of causes and a third hearing is to be held we will consider appellants' assigned propositions.

II. The trial court, without any objection, with only the court reporter present questioned the three children in his chambers. They were asked whether they were happy living with their sister and where they wanted to live and go to school. Each expressed a wish to remain in the sister's home. Shirley said she hated to hurt her parents but "it wouldn't work" if she returned to her parents' home.

Several of the court's questions were leading. Appellants argue the court thus erred. We do not agree.

State v. Drake, 128 Iowa 539, 540, 105 N.W. 54, 55, says:

"The propriety of admitting leading questions depends largely upon the witness under examination. If he or she is young or inexperienced, or laboring under evident timidity or embarrassment, or is apparently lacking in intelligent comprehension of the questions propounded, or is unwilling or evasive in giving the information sought, it is entirely proper to allow interrogatories of this character. On the other hand, the court may well sustain objection to the same questions to a witness in whom none of these characteristics appear. Manifestly the trial court can note these varying circumstances with far greater accuracy and discrimination than we can possibly do in an examination of the written record, and we should be very slow to interfere with its rulings in reference thereto."

Here the trial court had before him young, inexperi-

enced children who no doubt were timid and afraid. As expressed by Shirley they did not want to hurt their parents but desired to stay with their sister. Under the circumstances the court properly used some leading questions during his interrogation. The record discloses a sincere, careful effort to get from the children an expression of their preference. They had previously expressed the same preference to the witness Dr. E. R. Henning.

██ We have frequently stated in cases involving custody of a minor that the minor's desire is to be considered. In considering such matter, however, various factors are not to be lost sight of—the age of the minor, the length of time the minor has lived in the home for which preference is stated, the nature of the associations therein, the contacts with the one seeking a change of custody, the present and past relationships, the natural and legal rights of the contending parties, and any other matters throwing light thereon. Shaw v. Nachtwey, 43 Iowa 653; Knochemus v. King, 193 Iowa 1282, 188 N.W. 957; In re Guardianship of McFarland, 214 Iowa 417, 239 N.W. 702; Wooley v. Schoop, 234 Iowa 657, 12 N.W.2d 597; Lursen v. Henrichs, 239 Iowa 1009, 33 N.W.2d 383.

The court, no doubt, followed these general principles in arriving at his conclusions and order as he did not completely adopt the preference expressed by the children. However, the court's statement made in his findings and conclusions that "Prior to the start of school we will have another hearing and the children will elect where they wish to stay" gives us considerable concern. We must call attention to what is said in Wooley v. Schoop, supra, 234 Iowa 657, 668, 12 N.W.2d 597, 602: "When we speak of what is best for the child we do not mean that which the child wants."

██ While we approve the provisions for another hearing before school starts, at which the children may indicate where they prefer to live, we cannot approve permitting them to select their future home if their selection does not appear to be for their best interests.

III. Each parent while testifying admitted the farm home was unfit and in argument here concede the removal of the chil-

dren therefrom was proper. They contend, however, at the time of the second hearing they had realized their mistakes and made many improvements, including moving into a new home in Carroll, and the welfare of the children justified and required a return of the children to them. They argue the trial court erred in failing to so order.

Before further reviewing the record we refer to several general principles applicable in cases of this type.

The purpose of Code chapter 232 is to insure a child the care, custody and discipline that should be given by its parents. State ex rel. Wiley v. Richards, 253 Iowa 679, 680, 113 N.W.2d 285, 286, and citations.

This action is in equity (section 232.13). Our review is de novo. However, the trial court's findings are entitled to substantial weight. McKay v. Ruffcorn, 247 Iowa 195, 198, 73 N.W.2d 78, 80; State ex rel. Gilman v. Bacon, 249 Iowa 1233, 1237, 91 N.W.2d 395, 398; State ex rel. Gering v. Bird, 250 Iowa 730, 735, 96 N.W.2d 100, 102.

We have held so often that the primary consideration in cases of this kind is the welfare and best interest of the child that citation of precedents is unnecessary. See however State ex rel. Gering v. Bird, supra, and citations. While a parent has a presumptive right to his child this is not conclusive. The best interest of the child will prevail over the presumptions in favor of a parent. Adair v. Clure, 218 Iowa 482, 485, 255 N.W. 658, 660; Finken v. Porter, 246 Iowa 1345, 1348, 72 N.W.2d 445, 446; McKay v. Ruffcorn, supra, 247 Iowa 195, 202, 73 N.W.2d 78, 82; Stevenson v. McMillan, 250 Iowa 737, 740, 95 N.W.2d 719, 721; Thein v. Squires, 250 Iowa 1149, 1157, 97 N.W.2d 156, 162.

We return to a summary of the evidence. The Sanders owned the 340-acre farm where the family lived. It was worth at least $275 per acre. There was a $15,000 mortgage against it. In addition to the farm work, both parents worked in Carroll. The children and the home received little, if any, attention.

After the first hearing the parents leased the farm and moved into a house in Carroll in which Mrs. Sanders owned an interest. They cleaned and repainted this house. The only com-

plaint about it was that it did not have a shower or bath. Both parents continued to work in Carroll. The father was also working at the farm each day. They were financially well-fixed. and industrious workers but had failed to recognize their parental duties and responsibilities. This they admitted at the second hearing and attempted to prove many changes had been made. They wanted very much the return of the children.

The last paragraph of the report from the department of psychiatry (State University of Iowa) states:

"As a result of our studies we are able to conclude that Mr. Sanders is not suffering from a psychotic illness or a sociopathic personality. He is, however, a very passive individual who is quite dependent on his wife. He is unable to or afraid to express anger. He has genuine concern for his children's welfare but perhaps expects them to be more self-sufficient than they are capable of being. This could be due to his own upbringing. We feel this man would be responsive and cooperative to directive approaches."

Mrs. Sanders testified her husband had changed quite a bit and was more considerate. She said she was then more able mentally, emotionally and physically to take care of her children.

Both parents regularly visited the children at the Geary home. No ill feeling seemed to exist between the Gearys and the parents. The Gearys' interest seemed to be only to help the children and maintain a friendly family relationship.

The children were happy in the Geary home, the community and the school they attended. They had improved their personal appearance and gained weight. One witness said they appeared to be more alert mentally. No complaint was made of the care given the children in the Geary home.

Carl Sanders' uncle and neighbor testified: "Since the children have lived with the Gearys they got a color to them now. They were neglected. You know children belong with their folks but if their folks can't take care of them then its the next best place. If the older sister wants to take care of them, its all right. I believe they should be with the older sister. It don't seem that there is any great change in the parents."

Dr. E. R. Henning, a veterinarian, testified in part, "The

general condition of the children wasn't always the best and when this change came about I have tried to help it morally. In a small way I gave them financial help and so has the church. We have seen a considerable difference in the children since they have come into the Geary home. Their complexion has changed and they're dressed somewhat better. They are more alert, take part in conversations and are more aware of their surroundings and environment I think. They are getting along very well where they are. I have visited at the home several times and every time the home has been well kept. The children seem well content. They had probably ought to stay where they are."

From this record we must agree with the trial court's statement, "This is a very delicate case". With financially well-fixed, hard working, churchgoing parents who almost completely ignore their parental duties and responsibilities the trial court was confronted with an unusual and perplexing situation. Certainly these children must not be reared in filth and, without proper care, allowed to grow to maturity like the weeds which surrounded appellants' farm home.

We conclude the trial court's order made after the second hearing was proper except as indicated at the end of Division II hereof. As authorized by Code section 232.37, the court wisely continued the hearing until August 1964. We modify the order by omitting the provision "the children will elect where they wish to stay."

Like the trial court we, too, indulge in the hope that "this will work out nicely."—Modified and affirmed.

All JUSTICES concur except HAYS, J., not sitting.