BEN WILBERT ALLENDER, by his next friend, W. M. ALLENDER, Appellant, v. GEORGE H. SELDERS et al., Appellees.

No. 44720.

APRIL 2, 1940.

Lester L. Orsborn and George W. Egermayer, for appellant.

Clifford Powell and Leroy H. Johnson, for appellees.

BLISS, J.—The principles of law in a case of this kind have been frequently stated by this court, and there is no controversy between the parties respecting them. Neither do we find any material dispute in the facts. But since the facts are controlling in. the determination of the case, and in the application of the

legal principles, a summarized fact statement is necessary. In 1929 W. M. Allender, the father of the minor, was living at home with his parents and assisting in the operation of their 240-acre farm, about 12 miles southwest of Red Oak. He was then about 36 years old, and the only child in the home of his elderly parents. Carrie Selders, about 30 years old, was teaching in the school of a nearby village at that time. She had attended the State Teachers College at Cedar Falls, and had taught school for 2 or 3 years. They kept company for about 2 years. She knew he was a farmer and that he would continue to farm the home place. These matters were discussed with his parents, and it was agreed that after their marriage they would live in the home with his parents. They were married in June 1931. She preferred teaching to housework and for 2 years taught school in the neighborhood. During part of this time she roomed and boarded away from home. The trial court found that the marriage was ill-advised. We agree with this finding, but not, perhaps, for the same reasons. We think the record clearly shows that the wife was not endowed either physically, temperamentally, or perhaps, mentally, for the duties and burdens of marriage. She was afflicted with severe headaches apparently traceable to some spinal injury received when a child. Sexual intercourse was distasteful to her. Perhaps because she realized that giving birth to a child might be unnaturally difficult. There is no proof of any ill treatment from her mother-in-law, whom the court found to be ''of most excellent character'', yet there is hearsay testimony that living in the parental home was not pleasant for her. Her own conduct there, at times, seems most unreasonable. She would go upstairs and remain there for 2 and 3 days at a time, and would accept the water which her husband would bring her but refuse food. She became pregnant in the latter part of 1933 and during pregnancy her husband took her a number of times to a specialist at Omaha for examinations and treatment. She was confined in the Lutheran Hospital at Omaha and by Caesarean operation gave birth to the plaintiff, Ben, on July 31, 1934. The husband brought her and the baby back to his home from the hospital. In June 1935, she left with the baby, for the purpose, as she stated, of helping care for a niece in her parent's home, who had been injured in an automobile accident. Twice,

previously, she had left and remained away for short periods. She never returned to her husband's home. After staying at her parent's home for a short time, she took the baby to Kearney, Nebraska, where she worked until her job ceased because of the drouth. She returned to her parents for a short time, and then kept house for a schoolteacher. She visited with relatives at different times. In March 1937, she began work for a farmer in the neighborhood and remained with him until in October. At all times and places she kept the boy with her. Her husband visited with her quite frequently at her parent's home, and at her relatives, and where she worked. Their relations were pleasant. No one ever heard or saw them quarreling. He gave her money at times, and at other times she refused to accept money and tore up his check on one or two occasions. Grandmother Allender occasionally sent money, fruit and other things to the baby. In the summer of 1937 she became pregnant, and because of her condition she quit working in October. She would not go back to her husband's home, and said she would not be a burden upon her parents. Her sister and her husband, who was physically disabled, lived in a three-room house, in rather straitened circumstances, in the town of Henderson. She did not wish to add to their burdens. Her sister had lived in a trailer cabin for a year or two, and she suggested to her husband that he get one for her, and place it on her sister's lot in Henderson. He bought a secondhand trailer cabin from a construction company for $125, and placed it on the lot near her sister's house in Henderson. It was fitted with a stove and other necessary furniture. It was not banked and for that reason it was harder to heat. Her husband brought her cobs and coal, and also food, and testifies that he gave her money in the aggregate of approximately $100. Her parents and her sister helped with food, and in different ways. Her husband called upon her occasionally, and also took her to Omaha, to the specialist who had attended her in her first pregnancy, for examinations and treatment. She remained in the cabin until about the Christmas season or a little later, when she was with her parents for a short time. In the latter part of January 1938, her husband took her to a hospital in Omaha, where again by Caesarean operation she gave birth to a premature girl baby, on January 31, 1938. Because of the failure of the mother's blood to properly

coagulate she died at the birth of the baby. The baby weighing 4½ pounds was placed in an incubator and kept in the hospital for several weeks. Its father had a practical nurse go to the hospital and inform herself respecting the care of the baby. He then placed the baby in the care of this lady, who lives about a mile from his home. The baby has thrived and the father comes to see it several times a week. The father paid all doctor and hospital bills, and the burial expenses of his wife. The little boy was left by agreement with his mother's sister at Henderson, temporarily after the mother's death. He agreed to pay $2.75 a week for the boy's care. He had paid her $27, and on asking her for the boy, she told him he was at her parent's and had been there for about a week. He immediately went to her parents, the defendants, and asked for the boy, and was told by them that he would get the boy only on an order of the court. This proceeding was at once started, and trial was had in July 1938. It appears that the husband's father died a year or two after the former was married. The son then arranged to farm the 240-acre home place on a fifty-fifty rental basis. The farm is well improved. There is no incumbrance on the quarter section and an amortized loan of $2,000 on the eighty. The grandmother testified that her son was to have the farm at her death, and that her husband had so told the son and daughter-in-law before he died. The son owned all of the farm equipment and one half of 15 head of cattle and 240 hogs. All members of the Allender family bore a good reputation. There was no evidence to the contrary. Grandmother Allender testified:

"I would like for little Ben to come and live with us. We have plenty of room and plenty of money to educate him, and I would see that he is well taken care of. Wilbert's wife left when little Ben was about eleven months old. I did not know she was going to stay. She said she was just going home, that her cousin had been hurt. I never told her to leave and I wanted her to stay with us. * * * The relationship between Wilbert's wife and myself I thought was pleasant but she might have thought it unpleasant. I never paid any attention to her, just let her have her own way. I thought we got along alright. I knew she wanted to have a separate home of her

own and I never refused them permission to put one on the farm.''

The defendants own a 120-acre farm on which they placed an amortized government loan of $7,500 in 1924, which they said was about all paid. The trial court found they were ''in every way qualified physically, morally and otherwise for the care of the minor.'' The court also found that the father of the minor ''is an honest, respectable, law-abiding citizen'', but that he was ''not as careful, thoughtful and provident of his wife as he should have been.'' It may well be that he should have been more thoughtful but there were mitigating circumstances. She made it difficult for him to give her the proper care. In December 1935, after she left him, she became so nervous and distraught that he and her parents took her to Dr. Humphrey. The doctor testified as to her hysterical condition at this time. A glimpse of her mental attitude appears from a letter she wrote to her husband on December 30, 1935, as follows:

''Dear Wilbert. I will write a little to tell you I went in yesterday and had X-rays taken. Don't worry about the money to pay him now as I have a little here and will make the first payment he has asked for. * * * I just felt I couldn't ask you for it [money to repay her sister] as you have been so good to give me all I would need for Ben's and my clothes since we left down there. I finally thot of my insurance company and wrote and asked to borrow money there. * * * I have got along fine here [her parents' home] until just last week but have felt all of the time that I wanted a home for Ben and I. Well last week after I came back from Leona's [her sister at Henderson] Ethel [her niece at her parents] began picking on Ben one morning until I asked her to stop. Then the folks all said I was just imagining things and that Ethel wasn't picking on Ben at all. Well I felt so bad and thot nobody cared for Ben and I enough to want to live with us. They wanted me to go to see Dr. Humphrey but I wouldn't give up to go so mamma and John went to see you. I didn't know they were going or I wouldn't have listened to it but now since things have gone this far I'll go ahead and see what Humphrey can do for me. I don't think he can do anything as worry will bring it all back again and I can't help but worry. And now since you

1330

know all of this you don't need to bother with me any more if you would rather not. You know my mind isn't clear at times. Those awful headaches and head pains were not all stubbornness you see. But this is all trouble I had before you knew me. * * * I must quit now. Don't feel that you have to come any more at all. I couldn't blame you a bit if you don't ever come to see me again. Maybe you could find someone else who will make you a better wife and will not be crazy. With love, Carrie.''

An alleged copy of another letter from her to him was introduced in which she upbraids him for his conduct. There was also evidence that before the baby girl was born she stated that in case of her death she would like someone of her family to have Ben.

The proper determination of cases of this kind is both difficult and trying and always problematical. The plaintiff herein is not yet 5 years old. As in the case of Drumb v. Keen, et ux., 47 Iowa 435, 437:

''He was too young to be consulted, or to have definite views which should be regarded on this subject. It was and is the duty of the court to act for him, and to do that which, under the circumstances, is for his best interest and welfare.''

In discussing a proceeding of this kind, Justice Cardozo in People ex rel. Riesner v. New York Nursery & Child's Hospital, 230 N. Y. 119, 129 N. E. 341, 343, said:

''The writ of habeas corpus was limited in its origin to cases of restraint under color or claim of law (N. Y. Foundling Hospital v. Gatti, 203 U. S. 429, 438; People ex rel. Pruyne v. Walts, 122 N. Y. 238, 241). In time, however, it was extended to controversies touching the custody of children, which were governed, not so much by considerations of strictly legal rights, as by those of expediency and equity, and, above all, the interests of the child.''

Of such a proceeding the Tennessee court, in State ex rel. Jones v. Superintendent, 139 Tenn. 522, 201 S. W. 743, 744, Ann. Cas. 1918D 749, said:

''As it affects the custody of infants, the writ of habeas corpus rests on the assumption of a right in the State, para-

mount to any parental or other claim, to dispose of such children as their best interests require. The legal rights of a parent are very gravely considered, but are not enforced to the disadvantage of the child. Such is the universal practice."

See In re Barry, C. C. S. D. N. Y., 42 F. 113; In re Burrus, 136 U. S. 586, 10 S. Ct. 850, 34 L. Ed. 500; Green v. Campbell, 35 W. Va. 698, 702, 14 S. E. 212, 214, 29 Am. St. Rep. 843.

 The common law of England, and the statutes of the states of civilized countries uniformly recognize the parents or parent as the legitimate, natural guardian of their child. As stated by the Georgia court:

"The law does not fly in the face of nature, but rather seeks to act in harmony with it, and to that end encourages the formation and continuance of those ties which, by the inscrutable providence of God, bind man to his own flesh." Lamar v. Harris, 117 Ga. 993, 997, 44 S. E. 866, 868.

Under the statutes of Iowa, the parents are the natural guardians of the persons of their minor children, and are equally entitled to their care and custody, section 12573, Code 1935, and upon the death of one parent, the surviving parent becomes such guardian. Section 12574, Code 1935. While the mother of the plaintiff lived she had as much right, legally, to his custody as the father, but upon her death, that legal custodial right devolved upon the father. This right of a surviving parent is an absolute one, unless it has been relinquished by abandonment, contract, or otherwise, or unless the best interest and welfare of the child call for other care and custody. "Presumptively the parents (or the survivor of them if one is dead) have the right to the custody of their minor child." Bonnarens v. Klett, 213 Iowa 1286, 1288, 241 N. W. 483, 484. See also Risting v. Sparboe, 179 Iowa 1133, 162 N. W. 592, L. R. A. 1917E 318; Winter v. Winter, 184 Iowa 85, 166 N. W. 274; Adair v. Clure, 218 Iowa 482, 255 N. W. 658; Werling v. Heggen, 208 Iowa 908, 225 N. W. 952; Van Auken v. Wieman, 128 Iowa 476, 104 N. W. 464; Holmes v. Derrig, 127 Iowa 625, 103 N. W. 973; In re Guardianship of McFarland, 214 Iowa 417, 239 N. W. 702; Brem v. Swander, 153 Iowa 669, 132 N. W. 829; Jensen v. Sorenson, 211 Iowa 354, 233 N. W. 717.

[**3**] As stated by Justice Ladd, in Risting v. Sparboe, supra, 179 Iowa at pages 1136, 1138, 162 N. W. at page 594, L. R. A. 1917E 318:

"Human experience has demonstrated that children ordinarily will be best cared for by those bound to them by ties of nature, 'bone of their bone and flesh of their flesh.' Something more than the material things of this life is essential to the nurture of a child, and that something is the father's and the mother's love, or as near its equivalent as may be. Recognizing this, the law raises a strong presumption that the child's ·welfare will be best subserved in the care and control of parents, and in every case, a showing of such relationship, in the absence of anything more, makes out a prima facie case for parents claiming the custody of their children. 'Indeed', as ˅said in one case, 'this presumption is essential to the maintenance of society, for without it, man would be denaturalized, the ties of family broken, the instincts of humanity stifled, and one of the strongest incentives to the propagation and continuance of the human race destroyed.' * * * Recognition of what is for the best interest of the child will seldom interfere with the natural rights of the parent to the custody thereof, and never unless essential to its welfare or for the good of society."

However, as stated in some of the cases cited above, and in others, this presumption in favor of the parent, although it is a strong one, is nevertheless a rebuttable one. For reasons herein stated the parent may be deprived of that care and custody. The controlling consideration should be the present and future best interests of the child, with due regard to the natural rights of the parent. Ex rel. Shaw v. Nachtwey, 43 Iowa 653. As stated in Holmes v. Derrig, supra, 127 Iowa at page 628, 103 N. W. at page 974:

"It is true that the dominant consideration in cases of this kind is the interest of the infant, but the parent * * * has rights in the premises which cannot be ignored. * * * in the absence of extreme neglect of natural and legal duty courts will always be slow in refusing recognition to the paramount right of the parent, * * *."

These questions were fully discussed, with quotations from

our own and other decisions, in Adair v. Clure, supra, where, speaking through Justice Kintzinger, on page 485 of 218 Iowa, on page 600 of 255 N. W., we said:

"It is the general rule of law in this and other states that there is no ground upon which courts can interfere with the rights of the parents except that of imperative necessity."

With these rules to guide us, and keeping particularly in mind that the best interests and welfare of the plaintiff, both present and future, are paramount to the rights of the father, and also to those of the defendants, let us consider the facts a little further. The father never at any time abandoned the plaintiff or relinquished him to the care or control of others. His mother took him, rather clandestinely from the home the father provided, and there is no evidence that the boy was ever neglected or mistreated in that home. The father continued to visit the boy and helped provide for him. When he took his wife for the second confinement, the boy was necessarily left with her people. Upon the death of his wife, at the request of her sister that she would like to keep the boy, for a time, to soften the blow of the loss of her sister, he left the boy with her and agreed to pay for his care. The sister, without his permission, then surrendered the boy to the defendants, and upon his asking them for the boy he was told that he could have him only when the court said so. There was no offer on the part of the defendants to cooperate in the care of the boy. They demanded his sole custody. The father was already giving the very best of care to the motherless sister of the boy, and neither the defendants nor the aunt made any offer to relieve him of this burden. In their judgment apparently, he was a fit father to assume the present and future care of a prematurely born baby girl, but wholly unfit to assume the care of a five-year-old boy.

These defendants had never had the care of this boy. When he had been in their home his mother was always there to care for him. His expense to them had been only incidental. He had not been in their home but a week when the father asked for him. While they no doubt love him as a grandchild, the ties incident to the personal care of him are absent. This maternal grandfather and grandmother were respectively 69 and 62 years old. The burdens and the responsibilities of caring

for this boy are going to increase appreciably in the immediate years to come, and their ability to meet those burdens and responsibilities are going to progressively decrease. In the father's home is his mother, 76 years old, who has competent help. The father will be the owner of a well-equipped farm, free of incumbrance. The boy will be at home with him on the farm. Very shortly the baby sister will be in that home. It is true that when his mother passes away, he will have to have additional help to care for the children, but he is amply able to provide such help. Many fathers have been left in much more unfortunate circumstances, and yet have properly reared a family of children. This brother and sister should be kept together. The father has never had a fair chance to care for the boy. He is entitled to that opportunity, and the boy is entitled to have a father's care. In re Guardianship of McFarland, supra, under similar circumstances, Justice Wagner, speaking for the court said [214 Iowa 417, 429, 239 N. W. 708]:

"The presumption existing in favor of the father has not been overcome in the instant case. * * * No witness had declared that the father is not a fit and suitable person to have the custody of his boy. Without any hesitancy, the witnesses testified in favor of the plaintiff-father in this respect."

The record fully supports us in making the same statement in this case.

As has been the rule of this court for a number of years we have reviewed this appeal as one in equity. Barnett v. Blakley, 202 Iowa 1, 209 N. W. 412; Jensen v. Sorenson, supra; Barry v. Reeves, 203 Iowa 1345, 214 N. W. 519; Ellison v. Platts, 226 Iowa 1211, 286 N. W. 413.

As stated in Winter v. Winter, supra, 184 Iowa at page 88, 166 N. W. at page 275:

"It is highly desirable that the status of the child be fixed as quickly as possible, and that it be disturbed thereafter as little as possible."

Owing to the age of the defendants it is very likely that before many years some further change would be necessary in the custody of the boy if he be left with them. It is better in our judgment that the change be made now to the one who is legally entitled to his care, control and custody, since it is

our conclusion that it is better for both the present and future welfare, and the permanent good of the plaintiff, that he be returned at once to the custody of his father. We are abidingly satisfied of the christian character and worth of the defendants and of their love for the boy, and we sincerely hope that because of their tender regard for him, and their love for his departed mother, they will soften their hearts toward the father, and will join with him in giving the best care possible to these two motherless children.

The judgment and decree is therefore reversed and remanded to the district court for the rendering and entry of a judgment and decree in conformity herewith.—Reversed and remanded.

HAMILTON, C. J., and HALE, SAGER, STIGER, OLIVER, MILLER, MITCHELL, and RICHARDS, JJ., concur.