VICTORIA LYNN DURST by SHELDON DURST, parent and natural guardian, appellee, v. ESTHER FERN ROACH et al., appellants.

No. 48364.

(Reported in 62 N.W.2d 159)

343

JANUARY 12, 1954.

James W. Hall, of Des Moines, for appellants.

Hammer & Matthias, of Newton, for appellee.

BLISS, C. J.— I. The principles of law involved in this case are well established, and the parties are not in controversy over them. For the most part, there was little dispute about the facts. Trial was had in the district court as in equity,

344

and it is reviewed here de novo. We stated in Barnett v. Blakley, 202 Iowa 1, 5, 209 N.W. 412, 414: "As now used and recognized, in cases involving the custody of children, the writ of habeas corpus operates to invoke the broad powers of the court of an equitable nature, to determine the question of custody of a minor child according as the welfare and best interests of the child may require, having due regard to the legal rights of parents or others." We have so held many times. Barry v. Reeves, 203 Iowa 1345, 1347–1349, 214 N.W. 519; Jensen v. Sorenson, 211 Iowa 354, 367, 233 N.W. 717; Ellison v. Platts, 226 Iowa 1211, 1215, 286 N.W. 413; Allender v. Selders, 227 Iowa 1324, 1330, 1331, 291 N.W. 176; Wooley v. Schoop, 234 Iowa 657, 658, 12 N.W.2d 597, 598; Watt v. Dunn, 236 Iowa 67, 73, 17 N.W.2d 811; In re Adoption of Perkins, 242 Iowa 1374, 1378, 1379, 49 N.W.2d 248; Joiner v. Knieriem, 243 Iowa 470, 479, 480, 52 N.W.2d 21; Blundi v. Blundi, 243 Iowa 1219, 1226, 55 N.W.2d 239; Helton v. Crawley, 241 Iowa 296, 309, 310, 41 N.W.2d 60; Watters v. Watters, 243 Iowa 741, 742, 53 N.W.2d 162.

II. As we have stated in the cases cited above, and in numerous other cases where the custody of a little child is the issue, the primary and paramount consideration for the guidance of the court is the welfare of the child. We have held that the child's welfare is superior to the claim of either parent, and that the feelings and wishes of the parent are entitled to but little, if any, consideration. Jensen v. Jensen, 237 Iowa 1323, 1324, 1325, 25 N.W.2d 316, and cases cited; Freese v. Freese, 237 Iowa 451, 458, 459, 22 N.W.2d 242, and cases cited; Helton v. Crawley, supra, 241 Iowa 296, 310, and cases cited; Herr v. Lazor, 238 Iowa 518, 525, 528, 28 N.W.2d 11, and cases cited; Scheffers v. Scheffers, 242 Iowa 563, 569–571, 47 N.W.2d 157; Maron v. Maron, 238 Iowa 587, 591, 28 N.W.2d 17.

III. The petition in this case was filed and the writ of habeas corpus was issued on October 7, 1952. Certain motions of defendants were presented on October 20, 1952, and overruled, and the taking of evidence was begun. On October 28, 1952, the court made a ruling in which, among other things, it said: "This is the most unsatisfactory case I have ever tried so far as I am concerned as to knowing what to do. My first thought is this. I am going to continue this case until the 16th day of April, 1953,

the next time I am here. I want to think it over thoroughly and I want to make more investigation about it. I will make an order as to the custody permanently during that time. It is the most unstable matrimonial number of parties I ever have had. The matrimonial adventures are too numerous and of too short duration to satisfy me that any of them are stable. As a matter of fact, the only stable party in the whole case is the least important one, Mr. Roach. * * *. At the present time I do not feel that it would be proper to take the child from the home that Mr. Roach is providing until Sheldon has made sufficient progress toward establishing himself a family life and reduction of his indebtedness to show that he can in all probability properly care for his child. As far as I am able to tell from the evidence he is a man of good moral character, does not drink. There is no evidence that he gambles, but there is also no evidence as to what he has done with the good salary that he has been receiving in his present position. The court is satisfied that at the present time the home that Mr. Roach is providing is the proper place for the child to remain. The court is satisfied that Mr. Roach is an honorable, stable man, a wonderfully successful tenant farmer and financially and otherwise able to have the child in his home during the period until this case comes on again. But I am saying to Mr. Roach that if Sheldon during that time establishes a good home, makes progress in paying his debts and generally shows that he is a proper person to have the custody of the child, that at that time it will be given to him."

After hearing additional testimony, the court, on May 18, 1953, made an "interlocutory order" that the child should be placed in the care, custody and control of the natural father, who, with his present wife, "Francine Durst, seem to have a stable marriage relationship", and that they are suitable persons and appear to be financially able to assume the responsibility of caring for the child. The court then stated:

"The court desires the passage of additional time to test that relationship and the financial capabilities of the said Sheldon Durst to maintain his home so as to be suitable for the permanent care, custody and control of the said minor child.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that

the full and complete care, custody and control of the child * * * be and it is hereby placed in Sheldon Durst, and the defendants deliver the said child to the said Sheldon Durst at his residence in Prairie City, Iowa, within ten days from the date hereof.

"IT IS FURTHER ORDERED that this matter be continued until the January 1954 term of this court."

We fully appreciate the solicitude and responsibility of the able and experienced trial court in seeking to reach what he believes to be the right decision. It was said by Justice Hamilton in Ellison v. Platts, 226 Iowa 1211, 1212, 286 N.W. 413: "Cases of this character tear at the heart strings of all normal human beings and are recognized as perhaps the most difficult and baffling to the courts of all the matters with which they have to deal." But we do not approve of a policy in cases of this kind of these intermittent hearings and long continuances. As said by Justice Evans in Winter v. Winter, 184 Iowa 85, 88, 166 N.W. 274, 275: "It is highly desirable that the status of the child be fixed as quickly as possible, and that it be disturbed thereafter as little as possible."

IV. For convenience we will speak of Sheldon Durst as the plaintiff, and the child, Victoria Lynn Durst, as Vickie, since she is so called in the record. She was born to Sheldon and Mary Durst on June 6, 1948. This was the first marriage of plaintiff. He and Mary were twice married and twice divorced. The first divorce was in November 1947 and the second divorce was on December 6, 1949, on his petition. He did not pay the doctor and hospital bills for the delivery of Vickie. He testified: "In regard to the hospital bill at the time of the child's birth I was broke and the county took care of it and released me of the bill at Broadlawns Hospital. * * *. At the time Vickie was born we were living in Des Moines with mother, and mother bought the layette for the baby. We lived with mother two or three months, then moved to ourselves and on three or four occasions the baby stayed with mother for periods of a week or so. At the time of my divorce from Mary, Mrs. Roach had the child on a farm near Osceola and that except for the period when Francine [his present wife] and I had Vickie while the

Roaches were moving and during the period when Francine and I had the child for about two months, Mrs. Roach has had the continuous care of the child."

When plaintiff and his wife, Mary, left his mother's home, they went to Mary's folks and Mary's brother. The house was too cold and Vickie was returned to plaintiff's mother. She testified: "I have taken care of her [Vickie], bought all of her clothes, even her first clothes. She spent over half of the first six months at my home, and I didn't take her again until she was 18 months old when I took her into my home to stay. * * * The mother had gone and left. At this time I was living on a farm near Osceola. Sheldon got his divorce on December 6, [1949]. I took the stand and the attorney asked me if I still was willing to take the child and raise her and I told him I was. When Sheldon was on the stand the attorney asked him what he was going to do with the child and he said I was going to take her. I took Vickie into my home then and I mentioned to Sheldon that he would be taking her away from me sometime, and he said: 'No, Mother, I never could hurt you like that.' " Under the court's order, Sheldon was to pay $25 a month toward the care of the baby. He made payments for a short period, and thereafter gave nothing but excuses. He bought himself "fancy clothes and big rings" and automobiles.

Plaintiff's second wife, in his third marriage, was Ruth Moredock. She was a witness for defendants and testified that she and plaintiff "were married August 18, 1950, and divorced October 18, 1951. One Wednesday night we had been at the Capitol Theater and when we came home he asked for his freedom and he got the divorce the next day. I signed some papers on Thursday morning, there was no property settlement but he did give me a $500 note payable in February 1952, which he has not paid. I had about $500 when we were married and helped him pay up some bills in Des Moines. He was driving a Newton Cab and hauling oil * * * and coal. I was working also and paid for groceries and helped pay the rent and gave him money when he asked for it. When he was working on the house I was down there and helped him with the blocks and helped him build it. I put a little money into the house. I also paid the expenses of getting married, i.e., the license, preacher and the trip down

there. He had around five cars while we were married, one was a pickup truck he used for hauling sand, etc., the other he used for pleasure. The night after he got the divorce he came into the Seven's Grill where I worked and three or four days later he came in with his present wife [Francine]. * * * We lived four or five months with my mother and had Vickie with me about two or three weeks. While there I helped to pay the grocery bills and the bills like the telephone and light bills. Once in awhile Sheldon would buy some groceries. * * * The rent was $35 a month and we both contributed to that. * * * I made the first payment on the furniture * * *. I never talked to any attorney about the divorce and was surprised when he obtained the divorce so quickly. * * * I don't know why Sheldon wanted a divorce." There was no denial of any of the testimony of Ruth Moredock.

Plaintiff's mother was employed mostly as a housekeeper for others. She kept Vickie with her wherever she worked. She testified: "I called Sheldon and asked him to take the child until I found work. After he hemmed and hawed around he finally said he would come and get her about a week later. I went to see her and could tell she wasn't happy and so I went home and talked it over with my sister, Mrs. Reynolds. I went back and got the baby with Sheldon's consent and took her to my sister's. She was at Sheldon's a week or ten days. She was never at Sheldon and Ruth's home more than two weeks and I paid money out of my own pocket to keep her until I found work. * * * I was at Woden, Iowa, about four months. In the meantime Vickie had pneumonia and also penicillin reaction. I was having a hard time, I was getting $15 a week. I would have to write Sheldon and beg him for money to even help pay the doctor bills. But he did send it and it was in fact the only money he ever sent me when he lived with Ruth."

The employment of plaintiff's mother took her to various places and sometimes the work was but temporary. She was employed at Lovilia, Rockford, Monticello, Minburn and Fort Dodge, before she was employed at the farm home of the defendant, Dale Roach. She testified: "I had Vickie with me all this time paying all her expenses. He [Sheldon] has given me about $40 voluntarily. When I was at Woden he bought her a

teddy bear, washing machine or some little things, that is the only gift he ever made her that I know of. I love Vickie as my own child and regardless of whether her father contributes to her support I am willing to continue the responsibility for this child."

Plaintiff's third and present wife was Francine Frederickson. It was stipulated that he married her on November 29, 1951; that she was twenty-one years old at the time of the trial, and that no child has been born of the marriage. She testified that she lived with her first husband eight months, and they had been married a year and a half when divorced. She attributed the family difficulties in her first marriage to her mother-in-law. Plaintiff was divorced from his wife, Ruth, on October 18, 1951. Francine testified that she met plaintiff two days after his divorce from Ruth and went with him to a policemen's dance. Plaintiff said he met her two weeks after the divorce from Ruth. Ruth said he brought Francine around to her three or four days after the divorce. The plaintiff's 17-year-old brother, Darwin Durst, in the Air Force at Chanute Field, Illinois, was a witness for his mother. He and his girl-friend went with plaintiff and Francine to Missouri where the last named couple was going to apply for a marriage license. They arrived early and after waiting three hours for the courthouse to open "Francine backed out." About a week later plaintiff and Francine returned to Missouri and were married. Darwin had lived with plaintiff and his wife, Ruth, for a time and also with his brother and Francine. He testified that plaintiff had told him he "talked to Francine a couple of times, before he was divorced, and she flirted with him. I heard them quarreling on occasion and at times Francine would use profanity. * * * I have observed Vickie in my mother's home, and my mother treats her as one of her own. I have seen Vickie climb into her lap and hug and kiss her. She seemed to get along very well with the Roach children. I have had a pleasant relationship with my brother, but I do believe my mother's home would be the best place for Vickie. * * * I heard Sheldon tell my mother that he would never take Vickie away from her." Speaking of his childhood after his parents were divorced, he testified: "I do not recall at what age

I went to live with my aunt, but I did go with my mother when I was in the second grade and stayed with her through the eighth grade, then I went to Arkansas and lived with my father for a year, and then we moved to Guthrie Center, Iowa."

The defendant, Dale Roach, age forty-one, a farmer by occupation, operated a rented farm for eight years in Atchinson County, Missouri, a few miles south of the Iowa line. While living on this farm, and on March 8, 1951, his first wife died, leaving him the care of three young children. Plaintiff's mother came to him as a housekeeper in May 1951. They were married August 3, 1951. As a witness for himself and wife he testified: "Mrs. Roach had come to my home to help me care for my youngsters and she has been a wonderful mother to them and the children have accepted her as a real mother. Vickie came with Esther to my home in May 1951, and she and my children get along fine. I was born and reared on a farm and have farmed for myself for ten years. My first wife was sick three or four years before she passed away, and I had quite a bit of expense, had to hire help in the home part of the time, and then the operation expense, my indebtedness stands at $2500. We have a deep freeze and can [vegetables], and butcher our own meat. * * * At the time of my marriage to Mrs. Roach, I knew of her four previous marriages. She brought no property into the marriage. * * * I am very willing to provide for this child regardless of whether the father provides any support or not. We take Vickie to Sunday School and Church, belong to the United Presbyterian Church, and have family worship in our home."

Asked what arrangements he had made for his children's future education, he answered: "Well, the boy, our two boys and a girl—the boys have a sow and raise their own pigs and the girl has a cow and the boys have a bank account and they have $2000 insurance each and the girl has $1000 insurance. We have hospital insurance, Blue Cross and Blue Shield that protects Vickie. If Vickie is permitted to remain in our home I am willing and certainly will make the same arrangements for her as for my own children as she grows up."

A number of neighbors and others testified approvingly of the defendants. The pastor of the First Baptist Church of Tarkio, Missouri, said: "I have been acquainted with the Roaches

since a year ago last August. They were in regular attendance at the services at my church throughout the time they lived in Missouri, and I was in their home a number of times. On one occasion I was there for a meal and came in unexpectedly at other times. My observations were that it was a better than average furnished farm home, neatly and efficiently kept. Mr. Roach is a very efficient farmer and good manager. He had a very large number of sows with little pigs. In that the children were not all of one family, I noticed particularly the domestic condition of the home and noted that it was undoubtedly a harmonious condition and there was no friction of any sort. I would say very heartily it is a very good situation for Vickie."

The owner of the Missouri farm leased to Mr. Roach for eight years testified: "Mr. Roach was a very successful farmer and raised good crops. He was always right up to scratch with everything including the contract, etc. In my visits to the farm I found everything in the home in good condition, nice and clean always. The reason I had to ask Mr. Roach to leave was so I might rent the farm to my grandson who had married. My opinion on Mrs. Roach keeping a good home is based on one conversation with her and about three or four visits in the home. I have been in the home in Iowa on only one occasion, a few minutes this morning."

The cashier in an Elmo, Missouri, bank testified: "I have known Mr. Roach for ten years and have met Mrs. Roach when she would accompany Mr. Roach to the bank. Mr. Roach has a general banking account with us, he has borrowed money and at different times has bought bonds, sometimes for the children. He owes the bank $2500 at this time. He is an industrious and thrifty farmer and always made his payments as agreed to. I had an occasion to visit his farm, and his livestock appeared to be well cared for and he had very good farming equipment. * * * He has been with us a long time and is very dependable."

Mr. and Mrs. Huston operated a farm in Missouri adjoining the farm worked by the defendants. Mr. Huston testified: "Mr. and Mrs. Roach attended church very regularly and from my observation in the home on different occasions the children had a very good relationship. Dale seemed to have no different attitude between Vickie and his own youngsters. Mrs. Roach's atti-

tude was very good to all four of the children. The physical aspects of the home were very good. They had a deep freeze and I frankly have been amazed at how Mrs. Roach got so much garden stuff and things canned and prepared ready for the family. In my opinion this is a fit home in which to raise this youngster, Vickie, and I do not know any reason why this child should not be raised in that home properly. My wife gave piano lessons to Vickie."

Mrs. Huston testified that she had known Mr. Roach for about ten years and Mrs. Roach going on two years, and as neighbors they were in the homes of each many times: "Mrs. Roach kept a good house and did a lot of canning and had the deep freeze full of foods. The family attended church regularly * * *. I gave singing lessons to Vickie and she sang in my recital. From my observations Dale Roach never showed any partiality toward his own children, treated them all alike. My opinion is that this home is a fit and proper place to rear the youngster."

It was stipulated that defendants have lived on a 160-acre farm in Page County, Iowa, about midway between Shenandoah and Clarinda since March 1, 1952; the half interest of Mr. Roach in 36 head of cattle and 140 head of hogs was worth, respectively $3000 and $1000; the reasonable value of his farm machinery was $3000, of his Chevrolet automobile, $1100, and of his household furniture, $5000; he had $1000 in Government bonds, about $500 bank account, about 3000 bushels of corn, and carried life insurance of $14,000. The illness and death of his first wife added to the financial obligations of Mr. Roach, and he increased his bank debt to $4400, which he later reduced by $1150. Defendants live in a house having four bedrooms, kitchen, dining room, living room, play room, and complete bathroom.

At the time of trial—presumably the hearing in October 1952—Mrs. Roach was forty-two years old, and her son, the plaintiff, was twenty-five years old, so that she was apparently in her mid-teens when she married plaintiff's father in 1926. She testified he physically abused her. She procured a divorce from him in 1937 and the two boys were left in her care. She testified: "I was married to Mr. Huston, after I had known him

for six months, in 1939, and divorced him in 1946, and married him again in five weeks and divorced him again December 14, 1948. Then I married Virgil Day on March 28, 1949, and he divorced me the next March 1950, and Mr. Roach and I were married in August 1951. The boys' father knocked me around, and had to have the doctor for the beatings he gave me. The next man [Huston] started running around with women and drinking and writing bad checks. I had to work to keep him out of jail. When I married him again he promised to do better, and did for awhile, but started again. Mr. Day and I never did any quarreling. His mother wanted to live in our home. My boy, Darwin, kept fighting until he put us out. * * * When the boys' father and I were divorced my mother took Sheldon and Darwin. She kept Sheldon two or three years and my sister raised him. When I married Mr. Huston I took the boys and then Sheldon decided he wanted to go live with his father. So he went to Cambridge [Iowa] and didn't go back to Des Moines with me and finally decided to go into the Navy, when he was 17. Darwin stayed with a sister of mine near Elkhart for several years, and with me, and he went to school in Des Moines several years, with me. I have had many occupations to earn my own living. I worked in a store mostly, and after Mr. Day and I were divorced I worked on a farm. * * * I paid for the support of the children while they were living with my relatives and once in a while their father would send some money for their support. I refused to let Darwin be adopted. It was necessary for me to do housework to earn my living because Mr. Huston had lost his money and he had written bad checks. I had some bonds, about $600 worth, but I did not wish to use them. I finally used that up, Sheldon got part of it on loans, etc. I had to live and keep a baby and was only drawing $15 a week. I had a son to send money to and furnished money for Sheldon's first divorce. * * * From time to time when Sheldon owed me some money I would put it down and finally it amounted to $360, which I told him on January 1, 1951, I would forget if he would start with his child-support payments. He kept them up perfectly until about July, and after I was married to Mr. Roach he never paid another cent. The only time he paid me was when he was living with Ruth. * * * I never pleaded with Sheldon not to take the child

354

from me until just recently as he had always said he would never take the child from me. The only reason Sheldon wants the child now is for Francine. * * * Sheldon told me that Francine should have something to occupy her mind and that the doctor had suggested that they get Vickie for awhile."

Plaintiff first called at the Roach home in August 1951, at the wedding of defendants. He called again on New Year's Day, 1952. He was welcome to come any time. While the defendants were transferring from the Missouri to the Page County farm, Vickie spent seven weeks in February and March 1952 with plaintiff and his wife, Francine. Plaintiff with his wife and her mother, Mrs. Smith, came for Vickie. As they were leaving with her, plaintiff said: "Do not come for her before the first of April anyway, Mother." Later he wrote his mother that "when you come after Vickie, bring a trailer and pick up the refrigerator and things." Mrs. Roach planned to go after Vickie on March 28 (1952) and on the 27th Sheldon telephoned her that she should not come for Vickie until late in the afternoon as his wife was visiting her mother with Vickie. Mrs. Roach testified: "When I got there Sheldon said Francine was plenty mad and threatened to leave him if he let the baby go. Francine came home and jumped onto him and said, 'I thought you wasn't going to let her go.' When I asked Sheldon if he wasn't going to let me take her he said he wanted to but Francine said that he let her believe she could keep the child and at the same time let me think I was going to have her. I would put the baby's coat on and Francine would take it off. She had the child and I went over to take her, and the baby put her arms around my neck * * * and Francine let go and slapped me so hard that she knocked my glasses. Finally Sheldon took Francine in the bedroom and talked to her. I did not hear all the conversation, but I walked in there and she said, 'Go ahead and let her take her, Dusty, I have had enough trouble in my life, I do not want any more.' I put the baby's things on and she packed her clothes and Sheldon drove my car around to the back door and carried her clothes and toys down and put them in the car." Mrs. Roach went to her sister's home to stay all night. The next day Sheldon telephoned her that unless she returned Vickie he was coming to get her as Francine was going to leave him if he didn't get her

back. He became very angry and loud on the telephone. Mr. Roach came and took her and Vickie home to the farm. Later in that month (April) Sheldon, after writing her and apologizing for the quarrel in his home a few days before, telephoned from Shenandoah, just as they were taking Vickie to Missouri for her music lesson, that he was coming to take Vickie back with him. He followed them into Missouri and consulted the sheriff about arresting them for kidnapping. The sheriff did nothing, and Sheldon told the Roaches he could take Vickie at the point of a gun any time he wanted. He then had the county attorney telephone them. After leaving on this occasion, Mr. and Mrs. Roach heard nothing further from Sheldon until he appeared at their home on September 7, 1952. He said that he had promised Francine that he would bring Vickie back with him. He had been playing with Vickie, but when she heard him talk about taking her she started crying and climbed into her grandmother's lap and shook her head no. Sheldon became angry and later repentant. Mrs. Roach testified: "He said he was in an awful spot because the doctor had told Francine she could not have children and he had promised he would bring Vickie home. He said he did not know how it would turn out, kissed me goodbye and left. Two days later I received a letter from Francine and Sheldon. After the letter, we got the papers that started the action, we didn't know why they had started it after they had said they weren't going to do any more about it."

The letter and envelope Mrs. Roach referred to were received in evidence. The letter is signed "Francine & Sheldon" and the envelope postmarked "Newton Sept. 9, 1952" is addressed to Mrs. Dale Roach, Shenandoah. The letter is of considerable length, stating, among other matters, that: "* * * I will say that I am willing to accept things as they are * * * and I know that Dusty will do as I say * * *. All I want to do is make a good home for him and have children of our own. * * * If God ever sees fit to let us have the privilege of having Vickie with us, we will accept her gladly, but we will never raise our hand again to take her away from you." This is repeated again in the letter. The letter continues: "Mother [Francine's] told me that what I am writing in this letter was what I should have done a long time ago but I couldn't realize it then. * * * She said, 'that

it's wrong to try to take Vickie from you' like we tried three times before to do, and she was so very right as she always has been."

Within less than a month after the letter was written the habeas corpus proceeding was begun.

At the time of the first hearing in October 1952, plaintiff had been on the police force in Newton, Iowa, for twenty months. His pay on the police force was $215 a month, but later by doing work on his own time salvaging discarded automobiles he increased his monthly income to $270 a month. In spite of this substantial income, by reason of his way of life and needless and foolish expenditures, he became quite involved in debt. He testified: "I owe Helzbergs $80, an account on which I have not paid anything for a year. It was for a radio and some glassware. I still owe on the furniture. During the period of a year, I owned six cars, in fact, I had two financed at the same time; now I own a 1940 Chevrolet on which I owe money. I missed payments on this as well as my loan account with Public Loan Company, which is $290. Iowa Globe Loan, $240. * * * I missed the October payment on my furniture, and I owe $80 on attorney fees for my last divorce. * * * I borrowed $105 of the Jasper County Savings Bank to put a new engine in my car. On May 1st I borrowed $104.50 to help straighten some bills. I borrowed $94.99 in May and $212.55 in June to pay on furniture." He testified that he had driven his automobile about 15,000 miles, of which 13,000 were just for pleasure "and things I had to do."

When plaintiff testified at the May 1953 hearing, he was no longer on the police force at Newton, but was marshal at Prairie City at a salary of $300 a month. His job at Newton ended January 12, 1953, and his job as town marshal began March 25, 1953. In between these jobs he salvaged cars and worked awhile at the Montgomery Ward store in Newton. In Prairie City he and his wife live in an upstairs two-room-and-bath apartment. Renters downstairs also use this bathroom. Francine's mother loaned them $100 to move to Prairie City. Until April 5, 1953, and before they moved into the two-room apartment, plaintiff and wife had lived in a single room. The rental of the two-room apartment is $26.50 a month with utilities furnished. Plain-

tiff's take-home pay is $131 a month. On the day the plaintiff testified at the May hearing he said: "We moved an icebox in today and yesterday we moved a stove in. Prior to this we had been eating all our meals out at a cost of about $3.75 a day. * * * the bank has repossessed the car I had in Newton and also the truck. * * * I am quite certain of my job until the next election. I have no other job except I do sell a few book matches here and there. Since the last hearing I have paid off the Public Loan Company and the Globe Loan Company. I owed them each about $500 and paid them off on the 15th of this month." These debts were in fact settled by payment to the Globe Company of $271 and $150 to the Public Loan. Money borrowed from the State Bank at Prairie City was secured by an assignment of his wages and paid therefrom. On the day plaintiff was testifying, he settled the alimony note of $500, due his former wife Ruth, in February 1952, by the payment of $115. At the time of the May hearing plaintiff testified that he still owed $600 or $650. These figures do not include the $360 owing to his mother, nor a large amount of child-support money ordered by the court, nor money owing his mother-in-law.

The facts as shown by the record are controlling in determining this appeal. For that reason we feel it necessary to set them out at considerable length, in fairness to all concerned. We will discuss them but briefly, as they speak for themselves. We do not agree with the trial court's statement that Mr. Roach is the least important person of those involved. It is our conclusion that he is a most important person and factor in determining what is for the best interest and welfare, present and future, of Vickie. He is a capable, substantial, and successful farmer, highly respected where he has lived. He and Mrs. Roach are members of a church which they regularly attend, and they have private worship in the home. Vickie and the three Roach children are being brought up in that environment. They are already being rightly trained in good farm husbandry. They are having a wholesome life in a commodious, comfortable home. Mr. Roach has agreed to give to Vickie every advantage that he gives to his own children. Mrs. Roach has taken a mother's place in that home both to the Roach children and to

Vickie. She is co-operating fully and she has filed petition to adopt the Roach children.

Her earlier marriages were not the most fortunate ventures. But there is nothing in the record which besmirches her in any way. She was little more than a child when she first wed. When left with the care of Sheldon and Darwin, she made a good fight, under difficulties, to rear them. She had much of the care of Vickie from her birth, and her entire care from the time she was eighteen months old, with but little help from Sheldon, or from anyone else. She worked and paid all of her obligations. In the course of her many jobs she never failed Vickie, but took her with her and cared for her. Vickie had the love and the care that a mother could have given. She, of course, became much attached to her. Sheldon assured her that he would never take her from her, and yet in the altercations with Sheldon and Francine, she told "them that if they could provide a fit and suitable home and provide for her like I had been and take care of her, I wouldn't offer to fight them."

On the other hand, what has been the record of the plaintiff? He has had three wives and failed to properly support any of them. He has never been out of debt and has used little judgment in spending his earnings. He had money to buy cars, fine clothes, and flashy jewelry, gasoline for thousands of miles of pleasure riding, but there is no evidence that he ever bought a garment of any kind for Vickie. From July 1951 to the hearing in May 1953 he never made a contribution of one cent to Vickie's care, by his own admission. Under the record before us, his own mother bought the first, last, and all clothing for Vickie.

There is a vast difference between the Roach home and the one to which the trial court awarded her. Neither plaintiff nor his wife has had any experience in the rearing of a child. Their courtship and marriage was a hurried affair. Plaintiff had discarded Vickie and spent Ruth's $500 and he had divorced her but a few days when he married Francine. Sheldon assumes new obligations readily but shows little regard for past and primary ones.

While the law raises a strong presumption that a minor child's welfare will be best subserved in the care and custody

of a parent, the presumption is a rebuttable one. Joiner v. Knieriem, supra, 243 Iowa 479–481, 52 N.W.2d 21. The defendants preponderantly overcame the presumption.

 We are abidingly convinced that the welfare and best interest of Vickie are in the care, custody and control of the defendants.

The decree of the trial court is therefore reversed, the writ is annulled, and the cause is remanded for entry of decree in conformity herewith.—Reversed and remanded.

All JUSTICES concur.